HERRICK, FEINSTEIN LLP
Scott T. Tross (ST 3831)
One Gateway Center
Newark, NJ 07102-5310
(973) 274-2030

**MOTION DATE:  December 11, 2006**

CRAVATH, SWAINE & MOORE LLP
Ronald S. Rolfe
Michael L. Schler
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

Attorneys for Plaintiff
Conopco, Inc.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CONOPCO, INC.,<br><br>                              Plaintiff,<br><br>          -against-<br><br>UNITED STATES OF AMERICA,<br><br>                              Defendant. | Civil Action No. 04-6025 (JCL) |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF CONOPCO, INC.'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO THE UNITED STATES OF AMERICA'S CROSS-MOTION FOR SUMMARY JUDGMENT

November 6, 2006

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................. ii

Preliminary Statement ............................................................ 1

Argument ............................................................................... 3

I.    THE DEDUCTIONS ARE NOT BARRED BY SECTION 162(k). ........ 3

II.   THE REDEMPTIONS ARE DIVIDENDS ................................. 7

III.  REVENUE RULING 2001-6 IS NOT ENTITLED TO
      DEFERENCE. ...................................................... 13

IV.   THE DEDUCTIONS ARE NOT IMPROPER DOUBLE
      DEDUCTIONS. ..................................................... 17

V.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT
      WARRANTING DENIAL OF PLAINTIFF'S MOTION. .................... 21

Conclusion ............................................................. 27

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases**

*Am. Online, Inc. v. United States*, 64 Fed. Cl. 571 (Fed. Cl. 2005) ............. 15-16

*Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) ................. 22

*Boise Cascade Corp. v. United States*, 329 F.3d 751
    (9th Cir. 2003) ..................................................................................... passim

*Boyle v. County of Allegheny, Pa.*, 139 F.3d 386 (3d Cir. 1998) ..................... 26

*Brenner v. Commn'r*, 62 T.C. 878 (1974) ......................................................... 17

*Charles Ilfeld Co. v. Hernandez*, 292 U.S. 62 (1934) ....................................... 17

*Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) .................................................................................. 13

*Cohen v. Bd. of Trs. of the Univ. of Med. & Dentistry of N.J.*,
    867 F.2d 1455 (3d Cir. 1989) (en banc) ...................................................... 24

*Colgate Palmolive Oil Co. v. W.L. Gore Assocs.*,
    919 F. Supp. 767 (D.N.J. 1996) ................................................................. 24

*Comm'r v. Stockly*, 221 F.2d 745 (3d Cir. 1955) ............................................... 3

*Fort Howard Corp. v. Comm'r*, 103 T.C. 345 (1994), *superseded*
    *by legislation*, Pub. L. No. 104-188, *as recognized in*
    *Fort Howard Corp. v. Comm'r*, 107 T.C. 187 (1996) ................................... 5

*Fort Howard Corp. v. Comm'r*, 107 T.C. 187 (1996) ......................................... 6

*Gitlitz v. Comm'r*, 531 U.S. 206 (2001) ..................................................... passim

*McLaulin v. Comm'r*, 115 T.C. 255 (2000) ....................................................... 14

*O'Shaughnessy v. Comm'r*, 332 F.3d 1125 (8th Cir. 2003) .............................. 15

*OfficeMax, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005) ........................ 15

ii

Page(s)

*Omohundro v. United States*, 300 F.3d 1065 (9th Cir. 2002)........................... 15

*Orsatti v. N.J. State Police*, 71 F.3d 480 (3d Cir. 1995)................................25-26

*Reese Bros. v. United States*, 447 F.3d 229 (3d Cir. 2006) ............................... 15

*Reimels v. Comm'r*, 436 F.3d 344 (2d Cir. 2006)............................................... 15

*Skidmore v. Swift*, 323 U.S. 134 (1944)............................................................... 15

*Tedokon v. Comm'r*, T.C. Mem. 2002-308, 2002 WL 31828624
    (T.C. Dec. 17, 2002) ..................................................................................... 16

*United States v. Davis*, 397 U.S. 301 (1970) ........................................... 7, 8, 12

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ......................................13-14

*United States v. Skelly Oil Co.*, 394 U.S. 678 (1969) ......................................... 17

## Statutes & Rules

26 U.S.C. § 162(k) ........................................................................................ 1, 5, 16

26 U.S.C. § 302(b) ......................................................................................... passim

26 U.S.C. § 404........................................................................................... 16, 19

26 U.S.C. § 404(a)(9)......................................................................................... 19

26 U.S.C. § 404(k)...................................................................................... 1, 2, 19

26 U.S.C. § 404(k)(5)(A) ............................................................................ 2, 13, 16

Fed. R. Civ. P. 56 ............................................................................................ 1, 24

## Other

Dividends Paid Deduction for Stock Held in Employee Stock
    Ownership Plan, 71 Fed. Reg. 51,471-01 (Aug. 30, 2006)
    (codified in relevant part at Treas. Reg. § 1.404(k)-3) ......................16-17, 19

Page(s)

Rev. Rul. 2001-6, 2001-1 C.B. 491 .................................................. 2, 13, 16, 17

Rev. Rul. 76-385, 1976-2 C.B. 92 ..................................................7-8, 9, 10-11

Small Business Job Protection Act of 1996,
   Pub. L. No. 104-188, 110 Stat. 1755 ............................................... 5

Treas. Reg. § 1.302-2(b) ................................................................ 12

Pursuant to Federal Rule of Civil Procedure 56(a), Plaintiff Conopco, Inc. ("Plaintiff")[1] respectfully submits this Reply Memorandum of Law in Support of its Motion for Summary Judgment and in Opposition to the United States of America's ("Defendant") Cross-Motion for Summary Judgment.

## Preliminary Statement

The Ninth Circuit ruled in *Boise Cascade Corp. v. United States* ("*Boise Cascade*") that payments essentially identical to the payments here at issue ("the ESOP Payments") are deductible dividends under Section 404(k).[2] 329 F.3d 751, 752 (9th Cir. 2003).  In the face of this, and in response to Plaintiff's motion for summary judgment, Defendant raises five discrete challenges to the deductions Plaintiff claims.

- First, Defendant argues that the deductions are barred by Section 162(k), despite the fact that the *Boise Cascade* court expressly considered and rejected Defendant's arguments on facts significantly more favorable to Defendant than the present facts.

---

[1] For simplicity, this memorandum uses "Plaintiff" to refer to Conopco, Inc. and its predecessors Bestfoods and CPC International Inc.

[2] All Section references are to the Internal Revenue Code of 1986, 26 U.S.C., as in effect in the years in question.

- Second, Defendant argues that Section 302(b)(1) bars dividend treatment of the ESOP Payments, but points to no authority even suggesting that reductions in ownership interest as small as the miniscule reductions that occurred by virtue of the redemptions here could trigger Section 302(b)(1).

- Third, Defendant argues that this Court should defer to the interpretation of Section 404(k)(5)(A) stated in Revenue Ruling 2001-6, despite the fact that the "interpretation" in question was a bare-bones assertion without explanation and the fact that when the Internal Revenue Service ("Service") enacted new regulations in 2006 to deny deductions of the sort here claimed, the Service specifically made the new regulations prospective and declined to give the regulations retroactive effect.

- Fourth, Defendant argues that allowing the deductions here claimed would constitute an impermissible "double deduction", despite the facts that Plaintiff paid cash equal to the full amount of each deduction claimed, that Defendant agrees that Section 404(k) unquestionably allows a double deduction to some extent, that Section 404(k) explicitly provides for the deduction here claimed

2

and that under *Gitlitz v. Commissioner*, a statutory deduction is not disallowed solely because it results in a double tax benefit. 531 U.S. 206, 219-20 (2001).

- Fifth, Defendant claims that there are disputes of material fact, even though no fact in issue could affect whether the ESOP Payments were properly deducted by Plaintiff.

Defendant's arguments do not gain strength by their number, and all fail to warrant denial of Plaintiff's motion.

## Argument

## I.   THE DEDUCTIONS ARE NOT BARRED BY SECTION 162(k).

Defendant's argument that Section 162(k) bars deductions of the type here claimed was expressly considered and rejected by the Ninth Circuit in *Boise Cascade*, the only case to consider the issue. This Court should follow *Boise Cascade*. *See Comm'r v. Stockly*, 221 F.2d 745, 748 (3d Cir. 1955) (decisions of other circuits interpreting federal tax law should be followed "where we cannot say that the other courts which have considered the problem have clearly misconstrued the law"); *see also* Memorandum of Law in Support of Conopco, Inc.'s Motion for Summary Judgment ("Pl. Mem.") 12-13.

Defendant argues that *Boise Cascade* was wrongly decided, because the court "did not consider whether there was a logical relationship between the taxpayer's redemption of stock and the ESOP's subsequent distribution of the proceeds". United States' Brief in Support of its Cross-Motion for Summary Judgment and in Opposition to Conopco's Motion for Summary Judgment ("Def. Mem.") 7-9. This is simply not true. In *Boise Cascade*, the Ninth Circuit directly analyzed the relationship between the redemptions and subsequent distributions and held that Section 162(k) was not applicable because the "triggering event" for the deduction (the origin of the claim) was the election by members under the ESOP to receive cash payments—not the decision of the taxpayer to redeem stock. 329 F.3d at 757-58. As in *Boise Cascade*, the origin of the claim here is the election of terminating employees to receive cash distributions of the values of their accounts. *See* Trust Agreement § 5.2, Declaration of Ronald S. Rolfe dated September 13, 2006 ("Sept. 13 Rolfe Decl.") Ex. A, at C003237; 1991 Letter to Trustee, Sept. 13 Rolfe Decl. Ex. Y, at C011231-C011232. Indeed, since the taxpayer in *Boise Cascade* was contractually obligated to redeem shares when terminating employees elected to receive cash distributions (329 F.3d at 757), and Plaintiff was not so obligated, the redemptions and distributions here are

even more independent than in *Boise Cascade*.[3]   Defendant's arguments should therefore be rejected.

Second, Defendant argues that the Ninth Circuit in *Boise Cascade* improperly invoked the origin of the claim test, and relies on *Fort Howard Corp. v. Commissioner*, 103 T.C. 345 (1994), *superseded by legislation*, Pub. L. No. 104-188, *as recognized in Fort Howard Corp. v. Commissioner*, 107 T.C. 187 (1996).  Def. Mem. 7-9.  In the first *Fort Howard* case, the Tax Court held that Section 162(k) precluded the deduction or amortization of investment fees, other than interest, paid to borrow funds used in a leveraged buyout.  103 T.C. at 353.  In response to the first *Fort Howard* decision, the Small Business Job Protection Act of 1996 amended Section 162(k) to provide explicitly that deduction and amortization of non-interest investment fees are not barred by Section 162(k).  Pub. L. No. 104-188, § 1704(p), 110 Stat. 1755, 1886-87.

---

[3] Defendant asserts that Plaintiff's lack of a contractual obligation to redeem shares is "disputable", but fails to offer a single fact in support of its argument. Def. Mem. 11.  Defendant then argues that Plaintiff might be found to have a fiduciary obligation to redeem shares (Def. Mem. 11 & n.3), but neither explains why nor cites any authority in support of this assertion.  Even if Plaintiff were deemed to be a fiduciary under the terms of the ESOP, and even if Plaintiff were found to have an obligation to fund employee distributions in the event the Employee Stock Ownership Trust ("Trust") were unable to do so, there is no reason why Plaintiff would have needed to do so by redeeming shares (as opposed to simply having made payments to the Trust).  Defendant's unsupported assertions are without merit.

Thus, Congress enacted legislation that expressly overruled the result in *Fort Howard*, as the *Fort Howard* court subsequently recognized. 107 T.C. at 189 (reversing its earlier holding). This Court should therefore reject Defendant's arguments and follow *Boise Cascade*. Indeed, Defendant admits that the first *Fort Howard* decision is no longer good law. Def. Mem. 8.

Finally, Defendant places significant emphasis on the 1991 letter sent by Plaintiff's Pension Committee to the Trustee of the Employee Stock Ownership Trust ("Trust"). *See* Sept. 13 Rolfe Decl. Ex. Y. The letter describes the practice by which distributions to employees should be made. *Id.* This practice is not in dispute. When employees terminated employment with Plaintiff and elected (or their beneficiaries elected) to receive a cash distribution, Plaintiff routinely redeemed the shares allocated to the employees' accounts, and the Trust then made distributions to the employees or their beneficiaries. This was not, however, as Defendant implies, the only means by which payments to employees could have been funded. Had the Trust ever been short of funds, Plaintiff could have contributed additional cash to the Trust, or the Trust could have converted its preferred stock into common stock and sold the common stock on the market, as the Certificate of Designations concerning the preferred stock in question explicitly provides. *See* Certificate of Designations, § 5(I), Declaration of Ronald S. Rolfe dated November 6, 2006

("Nov. 6 Rolfe Decl.") Ex. A, at C009285-C009286 (providing that if the Trustee determined that it had insufficient funds to provide for distributions to employees, the Trustee could inform Plaintiff of this fact, at which point Plaintiff had the option of either making a payment to the Trust sufficient to cover the imbalance or permitting the Trustee to convert the appropriate number of preferred shares into common stock, which the Trustee could then sell).

## II.     THE REDEMPTIONS ARE DIVIDENDS.

Section 302(b)(1) denies dividend treatment to a redemption if it is not "essentially equivalent to a dividend". A redemption is not "essentially equivalent to a dividend" if it meaningfully reduces the shareholder's proportionate interest in the corporation in question. *United States v. Davis*, 397 U.S. 301, 313 (1970). Defendant argues that all of the redemptions of stock held by the Trust were meaningful reductions of the Trust's interest in Plaintiff, even if, as Plaintiff asserts, the largest redemption (4,746 shares on July 23, 1997) constituted a mere 0.22 percent reduction[4] in the Trust's percentage ownership in Plaintiff. Def. Mem. 19-20. In support of its argument, Defendant cites one revenue ruling, involving a "minority shareholder whose relative stock interest in [the corporation in question] is

---

[4] *See* Plaintiff's Statement of Material Facts Pursuant to Local Rule 56.1 ("SMF") ¶¶ 48-49.

minimal", in which the Service argued that a 3.3 percent reduction in the shareholder's ownership interest caused by a redemption constituted a meaningful reduction. Rev. Rul. 76-385, 1976-2 C.B. 92. Defendant points out that the shareholder in Revenue Ruling 76-385 held 0.0001118 percent of the corporation's stock before the redemption, and 0.0001081 percent after the redemption, and argues that the redemption in Revenue Ruling 76-385 was therefore "smaller" than the largest redemption here. Def. Mem. 17, 20. Defendant's math is simply wrong, and Revenue Ruling 76-385 bears no relation to this case.

Defendant's calculations presuppose that the appropriate measure of a shareholder's change in ownership under Section 302(b) is simply to start with the shareholder's percentage ownership before the redemption and to subtract the shareholder's percentage ownership after the redemption. The larger the resulting number, the bigger the reduction in interest, and the stronger the argument for not affording dividend treatment under Section 302(b).

Defendant's method of calculation, however, is contrary to the clear purpose of Section 302(b) and the *Davis* test, which is to test the similarity of the redemption in question to a dividend (which generally does not involve a redemption of any share of stock). The only proper way to do this analysis is to compute the percent change in the shareholder's proportionate interest in the

8

corporation.[5]  Defendant's method of calculation leads to wholly uneconomic results, skewed by the shareholder's starting percentage interest.

For example, suppose a corporation has 100 shares of stock outstanding, of which 50 are owned by shareholder A and two are owned by shareholder B.  A redemption of two of A's 50 shares would reduce A's percentage ownership from 50/100 (or 50 percent) to 48/98 (or 48.98 percent), which under Defendant's method of calculation results in a reduction of 1.02 percent (50-48.98).  Alternatively, a redemption of one of B's two shares would reduce B's percentage ownership from 2/100 (or two percent) to 1/99 (or 1.01 percent), or, under Defendant's approach, a reduction of 0.99 percent (2-1.01). Since 1.02 is larger than 0.99, under Defendant's method of calculation, a redemption of two of A's 50 shares would be considered a more meaningful reduction in interest (and thus less dividend-like) than a redemption of one of B's two shares.  This makes no sense, since very little has changed from A's

---

[5] *See* Section 302(b)(2)(C)(i)-(ii) (explaining that whether a redemption is substantially disproportionate with respect to a shareholder's stock should be determined by calculating whether the percent change in the ratio of the shareholder's holdings to the total outstanding stock of the corporation before the redemption and after is less than 80 percent—in other words, that the appropriate measure is the percent change in proportionate interest); *see also* Rev. Rul. 76-385, 1976-02 C.B. 92 (noting that the proportionate stock interest held by the shareholder after the redemption was 96.7 percent of the percentage owned before the redemption, for a reduction of 3.3 percent).

point of view (A's new percentage ownership of 48.98 percent is almost 98 percent of A's old percentage ownership of 50 percent), while much has changed from B's point of view (B's new percentage ownership of 1.01 percent reflects a reduction of nearly 50 percent from its old percentage ownership of two percent). In reality, contrary to Defendant's position, the redemption of A's stock is far less meaningful, and thus far more dividend-like under the *Davis* test, than the redemption of B's stock. Plaintiff's method of calculation properly tests the meaningfulness of a redemption under *Davis* by calculating the before-and-after percentage ownerships and then computing that difference as a percentage of the initial percentage ownership.

Properly calculated, the percent change in proportionate interest in Revenue Ruling 76-385 (3.3 percent) was significantly higher than the largest change in proportionate interest in the present case (0.22 percent).[6] In addition, unlike the taxpayer in Revenue Ruling 76-385, a "minority shareholder whose

---

[6] Defendant also claims that Plaintiff's calculation includes changes in Plaintiff's outstanding stock unrelated to redemptions. *See* United States' Statement of Material Facts as to Which There Exists No Genuine Issue and Opposition to Certain of Plaintiff's Statement of Material Facts ("Defendant's Statement of Material Facts") ¶ 49. This is not correct. While certain spreadsheets produced by Plaintiff detailing each percent change in proportionate ownership caused by each redemption from 1994-1998 (Sept. 13 Rolfe Decl. Ex. K) take into account changes in Plaintiff's common stock, Plaintiff's calculations here do not.

relative stock interest in [the corporation in question] is minimal" (1976-2 C.B. 92), the Trust held millions of shares of Plaintiff's stock throughout the period in question, representing between two and three percent of Plaintiff's total outstanding stock (*see* SMF ¶ 12). This case is more closely akin to *Boise Cascade*, in which the trust owned millions of shares and the redemptions reduced the trust's ownership interest by a fraction of one percent. *See* Pl. Mem. 27. In *Boise Cascade*, the Service did not even attempt to argue that the redemptions meaningfully reduced the trust's ownership interest under Section 302(b)(1). 329 F.3d at 755.

Moreover, Defendant expressly takes issue only with one redemption, the single largest redemption, which reduced the Trust's ownership interest by 0.22 percent (meaning that the Trust's percentage ownership interest in Plaintiff was approximately 99.78 percent, or approximately 499/500s, of the percentage that it had been before the redemption). Defendant argues that this redemption meaningfully reduced the Trust's ownership interest. Defendant, however, does not expressly argue that all the other redemptions, each of which reduced the Trust's ownership interest by a smaller percentage, meaningfully reduced the Trust's ownership interest in Plaintiff. It is possible that Defendant intends to argue implicitly that *any* reduction in ownership interest is meaningful, and therefore that all the redemptions claimed are barred. This

11

(implicit) argument is unsupported by authority and plainly contradicts the concept of a "meaningful reduction" under *Davis*. 397 U.S. at 313.

Next, Defendant argues that allowing dividend treatment for the ESOP Payments would "contravene the Congress' purpose in enacting Section 302(b)(1)". Def. Mem. 20.  As explained more fully in Plaintiff's Summary Judgment Brief, the legislative purpose of Section 302(b)(1) is to protect capital gains tax treatment for *de minimis* shareholders.  Pl. Mem. 27-29.  That purpose is not implicated here, as the Trust was a large shareholder of Plaintiff, holding between two and three percent of Plaintiff's outstanding stock throughout the relevant period.  SMF ¶ 12.

Finally, Defendant notes that determining whether a distribution in redemption of stock is essentially equivalent to a dividend under Section 302(b)(1) "depends upon the facts and circumstances of each case".  Def. Mem. 15 (quoting Treas. Reg. § 1.302-2(b)).  The relevant material facts here are undisputed.  What is disputed is merely the legal consequence of those facts, which can be appropriately determined at the summary judgment stage.  Surely Congress did not intend that a jury trial is always required to render a decision on this issue.

Here, the reductions in the Trust's ownership interest in Plaintiff caused by the redemptions are unquestionably trivial, and the legislative

purpose behind Section 302(b)(1) to protect capital gains treatment for small shareholders is not implicated. Thus, the redemptions did not cause a "meaningful reduction" in the Trust's ownership interest in Plaintiff. The redemptions therefore are "essentially equivalent to a dividend" and Section 302(b)(1) does not bar dividend treatment of the redemptions.

## III.   REVENUE RULING 2001-6 IS NOT ENTITLED TO DEFERENCE.

Defendant argues that the Service determined, in issuing Revenue Ruling 2001-6, 2001-1 C.B. 491, that deductions similar to the deductions here claimed should be denied as an evasion of taxation under Section 404(k)(5)(A), and that this interpretation must be accorded "*Chevron* deference" by this Court (*i.e.*, followed unless it is determined to be arbitrary, capricious or manifestly contrary to the statute in question). Def. Mem. 22 (citing *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Defendant further implies that cases analyzing deference decided by this Circuit prior to *United States v. Mead Corp.*, 533 U.S. 218 (2001), are invalid. Def. Mem. 23. This argument is not correct.

In *Mead*, the Court explained that *Chevron* deference for an agency interpretation is appropriate when the interpretation is adopted in compliance with formal administrative procedures contained in the relevant statute that "tend[] to foster the fairness and deliberation that should underlie a

13

pronouncement" having the force of law. 533 U.S. at 230. Thus, the *Mead* court noted that "the overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication." *Id. Mead* represented a break from the traditional view of *Chevron* deference only to the extent it made clear that the absence of such formal procedures does not necessarily preclude *Chevron* deference so long as other circumstances indicate that such deference is appropriate. *See Mead*, 533 U.S. at 230-31.

A revenue ruling, however, is unilaterally adopted by the Service of its own accord without any notice and comment period. The first time that taxpayers learn about a revenue ruling is after the final text has been published by the Service. There is no opportunity to comment, either before or after the ruling is published. Thus, there is nothing about the adoption of a revenue ruling that indicates any procedure that "tend[s] to foster the fairness and deliberation that should underlie a pronouncement" having the force of law.

Perhaps for this reason, no court has applied *Chevron* deference to a revenue ruling, either before or after *Mead* was decided. *Cf. McLaulin v. Comm'r*, 115 T.C. 255, 263 (2000) ("We generally treat a revenue ruling as merely the Commissioner's litigating position not entitled to any judicial deference or precedential weight."). Some courts, after *Mead*, have afforded

14

revenue rulings a weaker form of deference known as "*Skidmore* deference",
under which agency interpretations are afforded deference based on the validity
of their reasoning, consistency with other pronouncements and overall
persuasiveness. *See Skidmore v. Swift*, 323 U.S. 134, 140 (1944) ("The weight
[accorded to an administrative] judgment in a particular case will depend upon
the thoroughness evident in its consideration, the validity of its reasoning, its
consistency with earlier and later pronouncements, and all those factors which
give it power to persuade, if lacking power to control.").

However, even since *Mead*, courts have been very willing to
evaluate revenue rulings critically, and, if appropriate, hold them invalid. *See
Reese Bros. v. United States*, 447 F.3d 229, 237-38 (3d Cir. 2006) (explaining
that courts may disregard revenue rulings if they conflict with the statute in
question or are otherwise unreasonable, and declining to afford any deference to
the revenue ruling at issue); *OfficeMax, Inc. v. United States*, 428 F.3d 583,
594-95 (6th Cir. 2005) (explaining that minimal analysis in a revenue ruling
"does not contain the hallmarks for receiving deference, whether under
*Chevron*, or under *Skidmore*").[7]

---

[7] *See also Reimels v. Comm'r*, 436 F.3d 344, 347 n.2 (2d Cir. 2006)
(applying *Skidmore* deference to a revenue ruling); *O'Shaughnessy v. Comm'r*,
332 F.3d 1125, 1130-1131 (8th Cir. 2003) (same); *Omohundro v. United States*,
300 F.3d 1065, 1068-69 (9th Cir. 2002) (same); *Am. Online, Inc. v. United*

Under these standards, Revenue Ruling 2001-6 falls far short of the type of ruling entitled to either *Chevron* or *Skidmore* deference. It primarily addressed Sections 162(k) and 404(k)(2), and included a single sentence following this discussion that states without explanation that deductions similar to the deductions here claimed would be disallowed under Section 404(k)(5)(A). Rev. Rul. 2001-6, 2001-1 C.B. 491. The ruling offered no reasoning as to why the deduction would be considered to constitute evasion of taxation. Likewise, it did not explain why, given that even the "traditional" application of Section 404 involves a double deduction (*see infra* Section IV), the "traditional" application of Section 404 does not constitute an evasion of taxation while the situation presented here does.

Finally, Defendant asserts that Revenue Ruling 2001-6 marked the official determination of the Service that allowing deductions in situations such as the case at bar would constitute an evasion of taxation. Def. Mem. 20. However, this assertion is flatly contradicted by the fact that, when the Service issued new regulations in 2006 barring the deduction here claimed, it explicitly did so on a prospective basis, and only after the Service's loss in *Boise Cascade* and the filing of Plaintiff's complaint. *See* Dividends Paid Deduction for Stock

---

*States*, 64 Fed. Cl. 571, 580 (Fed. Cl. 2005) (same); *Tedokon v. Comm'r*, T.C. Mem. 2002-308, 2002 WL 31828624, at *4-*5 (T.C. Dec. 17, 2002) (same).

Held in Employee Stock Ownership Plan, 71 Fed. Reg. 51,471-01, 51,473 (Aug. 30, 2006) (codified in relevant part at Treas. Reg. § 1.404(k)-3). Indeed, while the government in *Boise Cascade* noted in passing that Revenue Ruling 2001-6 had been issued,[8] it did not even attempt to argue that the ruling should be subject to deference, and the court in *Boise Cascade* certainly did not grant it any deference. Thus, the bare-bones analysis in Revenue Ruling 2001-6, which the Service declined to reinforce by retroactive application of the subsequent regulations, should not be afforded deference by this Court.

## IV.   THE DEDUCTIONS ARE NOT IMPROPER DOUBLE DEDUCTIONS.

Defendant argues that the deductions here claimed by Plaintiff, if permitted, would impermissibly allow Plaintiff "to deduct twice one economic expense" (Def. Mem. 24), and cites three cases, all of which predate *Gitlitz v. Commissioner*, 531 U.S. 206 (2001).[9] In *Gitlitz*, the Court expressly held that, when two tax benefits are permitted under the plain language of the Internal Revenue Code ("Code"), the fact that allowing both tax benefits may arguably result in a "double windfall" does not bar either benefit. As *Gitlitz* explained:

---

[8] *See* Brief for Appellant at *10 n.6, *Boise Cascade Corp. v. United States*, 329 F.3d 751 (2003) (No. 01-36086), 2002 WL 32103625 (Mar. 25, 2002).

[9] *See* Def. Mem. 24 (citing *Charles Ilfeld Co. v. Hernandez*, 292 U.S. 62, 68 (1934)); *id.* 26 (citing *United States v. Skelly Oil Co.*, 394 U.S. 678, 684 (1969)); *id.* 26-27 (citing *Brenner v. Comm'r*, 62 T.C. 878, 885 (1974)).

> "courts have discussed the policy concern that, if shareholders were permitted to pass through the discharge of indebtedness before reducing any tax attributes, the shareholders would wrongly experience a 'double windfall': They would be exempted from paying taxes on the full amount of the discharge of indebtedness, and they would be able to increase basis and deduct their previously suspended losses. Because the Code's plain text permits the taxpayers here to receive these benefits, we need not address this policy concern."

*Id.* (citation omitted).

The present facts are even more favorable to Plaintiff than the facts in *Gitlitz* in at least two respects. First, here, unlike in *Gitlitz*, Plaintiff actually laid out cash equal to the full amount of both deductions that are alleged to be double deductions. Plaintiff paid the full purchase price for the stock that was deducted, and then paid the full amount of the ESOP Payments for which it claimed a deduction. *See* SMF ¶¶ 14-17, 24-30. There is no claim in this case that a single cash outlay is being deducted twice. Thus, there is much less, if any, of a so-called "double deduction" in this case than there was in *Gitlitz* (which involved only a single outlay of cash), and there is even less reason here to disallow the alleged "double deduction" than there was in *Gitlitz*.

Second, in *Gitlitz*, the double tax benefit arose from the interrelationship of two Code sections that was probably inadvertent on the part of Congress. *Id.* at 219-20. The Court held that, even in that case, the double benefit would be allowed unless and until Congress declared otherwise. *Id.*

18

In the present case, in contrast to *Gitlitz* and the pre-*Gitlitz* cases relied on by Defendant, the statute itself is clearly intended to allow a double deduction at least in part. Section 404(a)(9) allows a deduction for the purchase price of stock, and this price inherently includes the present value of future dividends on the stock.[10]  In addition, Section 404(k) allows a deduction for those very same future dividends when they are paid to the ESOP and distributed to employees. Defendant does not dispute this critical point that Section 404 already provides for a double deduction to this extent. No court has ever held that when a statute expressly and intentionally permits a double deduction at least in part, the courts should disregard the clear language of the statute to prevent what the Service claims to be a broader double deduction. Such a holding would involve even greater line-drawing by the courts, and therefore an even greater intrusion by the courts into the role of Congress, than the more limited role that has been already rejected by the Court in *Gitlitz*.

For instance, Defendant's theory, in this situation, would require the courts to account for the fact that the preferred stock increased in value between the time it was purchased in 1989 and the times shares of preferred

---

[10] This point was conceded by the Service in Dividends Paid Deduction for Stock Held in Employee Stock Ownership Plan, 71 Fed. Reg. 51,471-01, 51,472 (Aug. 30, 2006) (codified in relevant part at Treas. Reg. § 1.404(k)-3).

stock were redeemed throughout the 1994-2000 period.  In 1989, the Trust purchased 2.2 million shares of preferred stock from Plaintiff for $200 million, or approximately $90.91 per share.[11]  Between 1994 and 2000, Plaintiff redeemed shares at an average cost of approximately $187.84 per share.[12]  Even if Plaintiff should be denied the $90.91 per share arguably reflecting economic overlap under Defendant's theory, it should still be entitled to deduct the amount of the redemptions representing gains in the value of the preferred stock in excess of the loan principal for the original purchase.  Section 404, however, makes no provision for parsing these expenses according to the extent they overlap as an economic matter with other expenses.  Rather, Section 404 simply allows deductions for both types of expenses.  After *Gitlitz*, it is clear that a court should not get involved in determining which deductions under Section 404 are permissible double deductions and which are impermissible double deductions.  Rather, any such exercise should be left to Congress.  *See Gitlitz*, 533 U.S. at 219-20.

Moreover, Defendant's position (that two deductions, each specifically allowed by the Code, may not both be allowed merely because together they allow a taxpayer "to deduct twice one economic expense"), if

---

[11] *See* Sept. 13 Rolfe Decl. Ex. B.

[12] *See* Sept. 13 Rolfe Decl. Exs. O-W.

accepted, would have far-reaching consequences well beyond Section 404, and,
indeed, throughout the Code. Such a rule would require taxpayers, the Service
and courts to conduct an analysis of every deduction taken by a taxpayer to
determine whether it might be, under some theory, economically equivalent to
another deduction claimed by the taxpayer. The Code simply does not make
such distinctions, and *Gitlitz* makes clear that any such distinction is to be made
by Congress rather than the courts. In the present case, Plaintiff claimed two
separate deductions based on full, separate cash outlays for each, Section 404
specifically allows each deduction and therefore under *Gitlitz* that should be the
end of the story.

## V.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT WARRANTING DENIAL OF PLAINTIFF'S MOTION.

Defendant attempts to raise a number of disputed facts, but none of
the disputed facts creates a genuine issue of material fact relevant to whether
the ESOP Payments are deductible. First, Defendant claims that Plaintiff's
redemption figures are refuted by certain records of transactions ("Fidelity
Annual Reports") between Plaintiff and Fidelity Management Trust Company
("Fidelity"), Trustee from July 1994 to 2000. Def. Mem. 28-29.[13] According to

---

[13] Defendant also complains that Plaintiff's account of the redemptions it
made is supported by nothing more than its refund claims. Def. Mem. 28.
Defendant does not explain why the business records attached to Plaintiff's

the Fidelity Annual Reports, Plaintiff made redemptions between 1994 and

2000 in the amount of $65,451,808. *See* Nov. 6 Rolfe Decl. Exs. B-H.

Plaintiff, however, did not claim a deduction for *all* of the shares it redeemed

throughout this period. For instance, in 1999 and 2000, when the Trust's

distributions to employees were made in more than one tax-reportable

transaction (typically a rollover transaction of part of the employee's balance in

the Trust into another plan, combined with a distribution of the remainder of the

balance to the employee), Plaintiff claimed a deduction only if each of the

reportable transactions was a cash distribution.[14] Thus, while the Fidelity

Annual Reports indicate that Plaintiff made redemptions in the amount of

$65,451,808 between 1994 and 2000, Plaintiff conservatively claimed only

redemptions in the amount of $47,753,608 on its amended tax returns. *See*

amended returns on Form 1120X for the tax years 1994-2000, Sept. 13 Rolfe

---

refund claims listing the redemptions (*see* Sept. 13 Rolfe Decl. Exs. O-U),
submitted under penalty of perjury (*see* Section 6065), are somehow
insufficient to establish Plaintiff's claims. In fact, every redemption claimed by
Plaintiff is supported by records provided by the Trustees. *See* Sept. 13 Rolfe
Decl. Exs. K, O-U, V, W. As Plaintiff has adduced facts proving its claims, it is
Defendant's burden to set forth facts disputing them. *Berckeley Inv. Group,
Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

[14] *See* Declaration of Steven M. Solinga dated September 12, 2006 ("Sept.
12 Solinga Decl.") ¶ 14; August 24, 2005 Federal Rule of Civil Procedure
30(b)(6) Deposition of Conopco, Inc. at 73-76 (testimony of Steven M.
Solinga), Nov. 6 Rolfe Decl. Ex. K.

Decl. Exs. O-U.  It is the redemptions Plaintiff claimed, not the increased total redemptions it may have made,[15] that are the subject of this suit.[16]

In addition to showing that Plaintiff made more redemptions than it claimed overall, the Fidelity Annual Reports show that Plaintiff made more redemptions than it claimed in each of the tax years 1994[17]-2000, with the exception of the 1996 tax year.  *See* Nov. 6 Rolfe Decl. Exs. B-H.  In 1996, the Fidelity Annual Reports show 2,861 fewer shares redeemed than claimed by Plaintiff.  *Compare* Sept. 13 Rolfe Decl. Ex. Q (showing 35,704 shares redeemed in 1996 for $5,049,139) *with* Nov. 6 Rolfe Decl. Ex. D (showing 32,843 shares redeemed for $4,678,973).  This discrepancy could affect the claim and interest to which Plaintiff is entitled with respect to these shares (potentially reducing Plaintiff's 1996 refund claim by $129,548, or less than

---

[15] In any event, Defendant does not explain how the Fidelity Annual Reports, which show that Plaintiff redeemed *more* shares than it claimed, could in any way contradict the fact that Plaintiff redeemed *at least as many* shares as it claimed.

[16] Indeed, Defendant does not dispute the amount of Plaintiff's refund claims for the tax years 1995 and 1998-2000.  *See* Defendant's Statement of Material Facts (taking issue only with Plaintiff's claims concerning the tax years 1994, 1996 and 1997).

[17] Fidelity did not become Trustee until July 1994.  SMF ¶ 9.  The redemptions as shown in the 1994 Fidelity Annual Report are greater for the period for which redemptions are indicated (July through December 1994) than the redemptions Plaintiff claimed in this period.  *Compare* Sept. 13 Rolfe Decl. Ex. O *with* Nov. 6 Rolfe Decl. Ex. B.

one percent of its total refund claim).[18]  Since this potential dispute of fact is not

relevant to whether Plaintiff is entitled to deduct the ESOP Payments in general,

and would not affect the remaining 99 percent of the refund it claims it is due,

this Court can grant partial summary judgment on the issue of Plaintiff's

entitlement to deduct the ESOP Payments and accept as undisputed that

Plaintiff made all of the redemptions it claims except with respect to these few

shares.  *See* Fed. R. Civ. P. 56(d); *Cohen v. Bd. of Trs. of the Univ. of Med. &*

*Dentistry of N.J.*, 867 F.2d 1455, 1463 (3d Cir. 1989) (en banc) (the federal

rules empower the court "'to withdraw some issues from the case and to specify

those facts that really cannot be controverted'" (citation omitted)); *Colgate*

*Palmolive Oil Co. v. W.L. Gore Assocs.*, 919 F. Supp. 767, 768 (D.N.J. 1996)

(granting partial summary judgment).  Clearly, it would be a waste of judicial

resources to require a full trial on the merits merely because the parties disagree

as to less than one percent of the refund to which Plaintiff claims it is entitled.

Finally, a disagreement between the records *might* be relevant if

the Fidelity Annual Reports showed a redemption so large on any given day

that the Trust's ownership interest in Plaintiff was meaningfully reduced and

Section 302(b)(1) was triggered, and Plaintiff's refund claims did not account

---

[18] *See* Declaration of Steven M. Solinga dated November 2, 2006 ("Nov. 2 Solinga Decl.") ¶ 3; SMF ¶¶ 24-30.

for such a redemption.  However, there is no such case here.  To be sure, as

Defendant points out, according to the Fidelity Annual Reports, the largest

redemption Plaintiff made (7,299 shares on May 4, 2000) is higher than the

largest redemption Plaintiff claimed (4,746 shares on July 23, 1997).  *See*

Declaration of Judy L. Beitsch dated October 11, 2006 ¶ 7.  However, the

redemption of 7,299 shares on May 4, 2000, accepting Defendant's figures as

accurate, would have reduced the Trust's percentage ownership interest in

Plaintiff by approximately 0.49 percent,[19] rather than the 0.22 percent reduction

caused by the largest redemption Plaintiff claims.  For the reasons explained in

*supra* Section II, such a small decrease would not constitute a meaningful

reduction of the Trust's ownership interest.  Since the largest redemption

Plaintiff made and claimed dividend treatment for, under either party's

calculations, did not constitute a meaningful reduction in the Trust's ownership

interest in Plaintiff, no redemption meaningfully reduced the Trust's ownership

interest for purposes of Section 302(b), regardless of which numbers are used.

As such, this potential dispute of fact does not constitute a genuine issue of

material fact.  *See Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)

(an otherwise supported motion for summary judgment cannot be defeated by

_____

[19] *See* Sept. 13 Rolfe Decl. Ex. J; Nov. 2 Solinga Decl. ¶ 4

the "mere existence of some factual dispute" if the dispute could not affect the

outcome of the suit under substantive law); *see also Boyle v. County of*

*Allegheny, Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (same).

## Conclusion

For the foregoing reasons, this Court should grant Conopco's motion for summary judgment and deny the United States of America's cross-motion.

November 6, 2006

Respectfully submitted,

HERRICK, FEINSTEIN LLP

By       s/ Scott T. Tross
          Scott T. Tross (ST 3831)
          One Gateway Center
          Newark, NJ 07102-5310
          Tel: (973) 274-2030
          Fax: (973) 274-6422

               - and -

          Ronald S. Rolfe
          Michael L. Schler
          CRAVATH, SWAINE &
          MOORE LLP
          Worldwide Plaza
          825 Eighth Avenue
          New York, NY 10019-7475
          Tel: (212) 474-1000
          Fax: (212) 474-3700

          Attorneys for Plaintiff Conopco, Inc.

Of Counsel:

Philip G. Cohen
Vice President - Tax
Unilever United States, Inc.
700 Sylvan Avenue
Englewood Cliffs, NJ 07632-3113