<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

---

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| CONOPCO, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 04-6025 (JAG) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

---

<u>**GREENAWAY, District Judge**</u>

In this action, Plaintiff Conopco, Inc. ("Conopco") seeks to recover approximately $13.8 million it allegedly overpaid in federal income taxes from 1994 through 2000.  Before the Court is Conopco's motion for summary judgment, in which it argues that distributions it made in redemption of stock held in its employee stock ownership plan are deductible as dividends paid under 26 U.S.C. § 404(k)(1).  The Government disagrees, and has filed a cross-motion for summary judgment.  For the following reasons, this Court will grant the Government's motion, and deny the claimed deductions.  Conopco's motion is denied.

I.      <u>**Background**</u>

Conopco,[1] a publicly-held New York corporation, established an employee stock ownership plan ("ESOP") in May 1989 as a part of its Savings/Retirement Plan for Salaried

---

[1] Conopco is the successor-in-interest to Bestfoods, Inc., and CPC International, Inc.  Plaintiff will be referred to as "Conopco."

Employees ("Savings/Retirement Plan").  Conopco and the Northern Trust Company[2]

("Trustee") entered into an agreement ("Trust Agreement") creating a Trust for the ESOP.

Pursuant to the Trust Agreement, Conopco issued approximately 2.2 million shares of Series A

voting convertible preferred stock ("Preferred Stock" or "Preferred Shares"), which were

purchased by the Trust with funds the Trustee raised by issuing bonds.

The ESOP Trust held between two and three percent of Conopco's voting stock from

1994 to 2000.  As the owner of the shares, the Trust had the right to receive all dividends on the

Preferred Stock, to invest those dividends, and to exercise liquidation rights.  Under the terms of

the ESOP, the Trustee allocated the Preferred Shares to participating employees' ("members")

accounts.  Because they were not the owners, however, the members had no right to receive or

hold the shares held in their accounts.

When members ended their employment at Conopco, the ESOP (subject to some

restrictions) permitted them to elect to receive the value of the Preferred Stock credited to their

account either as cash, Conopco common stock, an annuity, distributions rolled into an

Individual Retirement Account, or a combination of the above.  Conopco had complete authority

under the Trust Agreement to direct the Trustee to make payments out of the Trust.  Pursuant to

that authority, Conopco instructed the Trustee that when terminating members requested ESOP

benefit payments, Conopco would redeem the Preferred Shares in the terminating members'

accounts.  After receiving the redemption proceeds from Conopco in return, the Trustee would

distribute those funds in the form of benefit payments to the terminating members.

_____

[2] The Fidelity Management Trust Company succeeded Northern as the Trustee in July 1994.

From 1994 through 2000, the following number of Preferred Shares were redeemed from the Trust for terminating members requesting cash benefit payments:

| Tax Year | Redeemed Shares | Redemption Proceeds/Requested Deduction | Claimed Refund |
|---|---|---|---|
| 1994 | 12,779[3] | $1,217,066 | $425,973 |
| 1995 | 30,174 | $3,686,254 | $1,290,189 |
| 1996 | 35,704 | $5,049,139 | $1,767,189 |
| 1997 | 52,941 | $9,485,172 | $429,920 |
| 1998 | 65,082.163 | $12,581,659 | $4,403,581 |
| 1999 | Not of Record | $8,635,765 | $3,022,518 |
| 2000 | Not of Record | $7,098,553 | $2,484,493 |
| Totals | 196,680.163 (appx) | $47,753,608 | $13,823,863 |

Conopco asserts that the cash redemption proceeds it paid to the Trust are "applicable dividends," which qualify for a deduction under 26 U.S.C. § 404(k)(1). Conopco attempted to claim the deductions in its timely filed Amended U.S. Corporation Income Tax Returns (Form 1120X) for the subject tax years; however, the Internal Revenue Service ("IRS") denied Conopco's 1994-1997 refund requests, and, as of September 2006, had yet to respond to Conopco's 1998-2000 requests.

On December 8, 2004, Conopco filed this action against the United States for a refund of wrongfully collected taxes under 26 U.S.C. §7422.[4] Following discovery, the parties cross-

---

[3] The Government raises minor disagreements with Conopco's redeemed shares figures for 1994, 1996, and 1997. However, the Government does not contest Conopco's redemption proceeds figures or the amounts Conopco claims it is entitled to if indeed, it did overpay its taxes in those years.

[4] Section 7422(a) provides for the recovery of "any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected

moved for summary judgment.  This Court has jurisdiction under 28 U.S.C. §§ 1340,[5] and

1346(a)(1).[6]

## II.    <u>Standard of Review</u>

Summary judgment is appropriate if there is no genuine issue as to any material fact and

the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56; <u>Serbin v. Bora</u>

<u>Corp.</u>, 96 F.3d 66, 69 n.2 (3d Cir. 1996).  When evaluating a summary judgment motion, the

Court must "draw all reasonable inferences in favor of the non-moving party."  <u>Armour v.</u>

<u>County of Beaver</u>, 271 F.3d 417, 420 (3d Cir. 2001) (internal quotations omitted).  The burden

of showing that no genuine issue of material fact exists rests initially on the moving party.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Huang v. BP Amoco Corp.</u>, 271 F.3d 560,

564 (3d Cir. 2001).  Once the moving party has made a properly supported motion for summary

judgment, the burden shifts to the non-moving party to "set forth specific facts showing that

there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); <u>Anderson</u>, 477 U.S. at 242.

The mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment.  <u>Matsushita Elec. Indus. Co. v.</u>

<u>Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 500 (3d

Cir. 1991) (noting that a motion for summary judgment is not defeated by mere allegations,

---

without authority, or of any sum alleged to have been excessive or in any manner wrongfully
collected."

[5] Section 1340 states that the "district courts shall have original jurisdiction of any civil action
arising under any Act of Congress providing for internal revenue . . . ."

[6] Section 1346(a)(1) provides that the "district courts shall have original jurisdiction . . . of . . .
[a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to
have been erroneously or illegally assessed or collected . . . ."

general denials, or other "vague statements").  Rather, only disputes regarding facts that might affect the outcome of the lawsuit under the governing law will preclude the entry of summary judgment.  Anderson, 477 U.S. at 247-48.  If the evidence is "such that a reasonable jury could return a verdict for the nonmoving party," summary judgment should not be granted.  Id. at 248; Lawrence v. Nat'l Westminster Bank of New Jersey, 98 F.3d 61, 65 (3d Cir. 1996).

## III.   Discussion

The Government argues that Conopco's distributions in redemption are not deductible because they are not dividends under § 404(k)(2).  Even if deductible, the Government contends, the deductions should be disallowed either under § 162(k), as an evasion of tax under § 404(k)(5)(A), or under the double-deduction doctrine.  On August 30, 2006, the IRS issued Treasury Regulation § 1.404(k)-3, which states that § 404(k) deductions for "[p]ayments to reacquire stock held by an ESOP . . . used to make benefit distributions to participants" are not permitted under §§ 404(k)(2), 404(k)(5)(A), and 162(k).  That regulation, however, only applies prospectively, and thus, this Court's analysis here will proceed unencumbered.

### A.   Whether 26 U.S.C. § 404(k)(1) Allows Conopco's Claimed Deductions

Generally, a corporation may not claim a deduction for dividends paid to shareholders. See 26 U.S.C. § 311.  A deduction is allowed, however, for the amount of any, (1) "applicable," (2) "dividend," (3) "paid in cash by [a] corporation with respect to applicable employer securities."  26 U.S.C. § 404(k)(1).

It is not disputed that Conopco satisfies the first and third requirements.  Assuming Conopco's payments were dividends, they were "applicable" because they were "paid to the plan and [were] distributed in cash to participants in the plan or their beneficiaries not later than 90

days after the close of the plan year in which paid." § 404(k)(2)(A).  "[A]pplicable employer

securities" include those, like here, held by an employee stock ownership plan maintained by the

corporation paying the dividend.  § 404(k)(3)(A).  The parties dispute requirement number two:

whether Conopco's distributions in redemption were dividends.

### 1.      The "Dividend" Requirement

Generally, distributions in redemption of stock made from a corporation's earnings and

profits are dividends, and thus are taxable to shareholders as ordinary income.  See §§ 316;

302(d); 301; Comm'r v. Gordon, 391 U.S. 83, 88-89 (1968).  In four situations, however, a

distribution in redemption is treated instead as a sale of stock by the redeeming shareholder, and

therefore subject to favorable capital gains income tax rates.  See § 302(a); Levin v. Comm'r,

385 F.2d 521, 525 (2d Cir. 1967).  The first of those situations is at issue here: A redemption is a

sale and not a dividend if it "is not essentially equivalent to a dividend." § 302(b)(1).[7]  The

Government contends that Conopco's redemptions satisfy § 302(b)(1).

This so-called "dividend-equivalence test" originally was enacted in 1921 to distinguish

between a stock redemption that resembles a dividend, and one that resembles a sale, "because

without it the tax on dividends at ordinary income rates could easily be defeated by the simple

expedient of issuing more stock to the shareholders, who would then 'sell' back their new shares

to the corporation," and claim "that the proceeds of this alleged sale were taxable at capital gains

---

[7] A distribution in redemption of stock also does not qualify as a dividend if it results in a
substantially disproportionate redemption of stock, § 302(b)(2); a termination of the
shareholder's interest, § 302(b)(3); or a redemption from a noncorporate shareholder in partial
liquidation, § 302(b)(4).  The parties agree that none of these provisions apply to this case.  (See
Stip. of Facts, ¶¶ 30-32.)

rates because they represented proceeds from the 'sale' of a capital asset." Levin, 385 F.2d at 523.

The test proved difficult to apply, and the drafters of the Internal Revenue Code ("IRC") of 1954 in the House of Representatives sought to replace it with the strict, objective tests that now appear at §§ 302(b)(2) and (3). See United States v. Davis, 397 U.S. 301, 309-10 (1970). The Senate Finance Committee objected, and reinserted the dividend-equivalence test, noting that the House provisions "'appeared unnecessarily restrictive, particularly, in the case of redemptions of preferred stock which might be called by the corporation without the shareholder having any control over when the redemption may take place.'" Id. at 310 (quoting S. Rep. No. 83-1622, at 44 (1954)).

According to the Supreme Court of the United States, a redemption is "not essentially equivalent to a dividend" when it "result[s] in a meaningful reduction of the shareholder's proportionate interest in the corporation." See Davis, 397 U.S. at 313. Conversely, a redemption is "essentially equivalent to a dividend" when its effect "is to transfer the property from the company to its shareholders without a change in the relative economic interests or rights of the stockholders." Id. Despite its origins, the dividend-equivalence test is an objective one; it is irrelevant whether the corporation actually was motivated by a desire to use the redemption to avoid paying the higher ordinary income tax rates applicable to dividends. Id. at 311.

Here, it is not disputed that *some* reduction in the Trust's proportionate interest in Conopco occurred. The parties, however, dispute (1) the exact amount of that reduction, and (2) whether that reduction was "meaningful."

### a.      The Amount of the Largest Reduction

Over the course of the seven tax years at issue, Conopco made hundreds of individual redemptions of the Trust's Preferred Shares.  Conopco argues that because its largest single redemption failed to meaningfully reduce the Trust's percentage ownership in Conopco, none of its redemptions did, and thus, all were dividends.  On July 23, 1997, Conopco redeemed 4,746 shares, and claims that this decreased the Trust's proportionate interest in Conopco "by 0.22 percent of its ownership percentage before the redemption."  (Pl.'s Mem. 26 (citing Rolfe Decl. Ex. K, ESOP Spreadsheets, at C009231).)

The Government attacks this claim on two grounds.

### i.      The Number of Shares Redeemed

First, the Government contends that the July 23, 1997 redemption was not the largest redemption, because the Trustee's transaction records show that Conopco redeemed 7,299 shares on May 4, 2000.[8]  Conopco replies that the July 23, 1997 redemption reflects its largest redemption for which it is claiming a deduction.  The Government does not take issue with Conopco's explanation, and indeed, does not dispute that if Conopco is entitled to a refund for the 1997 tax year, Conopco is entitled to the full amount it claims.  Thus, this Court will accept the July 23, 1997 redemption of 4,746 shares as the largest Conopco made.

### ii.      The Percentage Reduction of Interest in Conopco

The Government's second objection, raised in its Local Civil Rule 56.1 statement of undisputed material facts, claims that Conopco's allegation that the Trust's proportionate interest

---

[8] This Court notes that the Government does not argue that Conopco's redemptions should be looked at as a collective sum, either by year, or over the entire course of the years at issue, for purposes of determining whether there was a meaningful reduction.

was reduced by 0.22 percent from its previous level as a result of the July 23, 1997 redemption is inaccurate.  Specifically, the Government argues that this figure also reflects other stock transactions the Trust made that day.

The Government does not cite to any part of the record to substantiate this allegation. Nor does it offer what it believes to be the correct percentage change in the Trust's proportionate interest.  Conopco replies that while certain entries in its records do reflect transactions in its common stock, this is not true of the July 23, 1997 calculation.  Because a "nonmoving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact," Pastore v. Bell Telephone Co. of Pa., 24 F.3d 508, 511-12 (3d Cir. 1994), this Court shall accept that the July 23, 1997 redemption caused a 0.22 percent reduction in the Trust's proportionate interest in Conopco.[9]

## b.    Whether the Reduction Was "Meaningful"

With the factual disputes resolved, the issue for the Court is this: whether a "meaningful reduction" took place when Conopco redeemed 4,746 of the Trust's approximately 2 million shares.  This redemption lowered the Trust's holdings in Conopco from 2.7884 percent to 2.7809 percent—a reduction that represents 0.0075 percent (7.5 thousandths of one percent) of Conopco's total outstanding voting stock before the redemption, and 0.22 percent (2.2 tenths of one percent) of the Trust's overall ownership percentage before the redemption.

A redemption can cause a shareholder's proportionate interest in a corporation to increase, stay the same, or decrease, depending upon how many shares are also redeemed from

---

[9] It is worth noting as well, that the Government does not dispute the Trust's proportionate interest in Conopco before and after the July 23 redemption.  The Government concedes that the 4,746 share redemption reduced the Trust's ownership in Conopco from 2.7884 percent to 2.7809 percent.  (Def.'s Br. 20 (citing Rolfe Dec. Ex. K p. C009231).)

other shareholders.  Under Davis, only redemptions that cause a "*meaningful* decrease" in proportionate interest are sales of stock.  397 U.S. at 313 (emphasis added).  All other redemptions are considered dividends.

For example, a redemption causing an increase in proportionate interest is a dividend.  In Levin v. Commissioner, a shareholder who owned 815 of 1300 outstanding shares (63 percent proportionate interest) redeemed 484 of her shares.  385 F.2d at 527-28.  Despite parting with over half of her shares, her proportionate interest in the corporation *increased* to 100 percent, because the 485 shares she did not own were also redeemed.  This "is most unlike a sale," the Court of Appeals for the Second Circuit concluded, since in return for the distribution the "taxpayer has not parted with anything justifying capital gain treatment."  Id.

Similarly, a redemption causing no change in proportionate interest is also a dividend.  For example, a pro-rata distribution in redemption of stock "is always 'essentially equivalent to a dividend' within the meaning of that phrase in § 302(b)(1)," because, by definition, it can never result in a reduction in one shareholder's proportionate interest in the corporation.  See Davis, 397 U.S. at 307.  In Davis, one shareholder held all 2000 shares of stock in a company that later redeemed 1000 of those shares.  Id. at 302-03.  Even though his shares were reduced by half, the shareholder's proportionate interest in the company remained unchanged at 100 percent.  See id.  Thus, the distribution in redemption was a dividend.

Finally, courts have found that a redemption causing a *non-meaningful* decrease in proportionate interest is also a dividend.  See, e.g., Levin, 385 F.2d at 527-28 ("[W]hen a taxpayer's . . . ownership decreases by a *significant* amount, we are justified in concluding that a *substantial* reduction in taxpayer's interest in the corporation has occurred warranting capital

gain treatment . . . . But when only a *small* reduction in control occurs, the distribution has been

held to [be] essentially equivalent to a dividend" (emphases added)); Brown v. United States,

345 F. Supp. 241, 246 (S.D. Ohio 1972) (declining to conclude that a 1 percent decrease in

ownership "constituted a '*meaningful* reduction'" of proportionate interest under Davis), *aff'd*

*without opinion*, 477 F.2d 599 (6th Cir. 1973), *cert. denied*, 414 U.S. 1011 (1973).

Such courts have looked to the effect a redemption has on three rights attendant to stock

ownership as indicators of a meaningful reduction: (1) voting control, (2) rights to share in

corporate earnings, and (3) rights to receive corporate assets upon liquidation.  See Himmel v.

Comm'r, 338 F.2d 815, 817 (2d Cir. 1964); Johnston v. Comm'r, 77 T.C. 679, 684-85 (1981).

Conopco urges this Court to follow the Court of Appeals for the Ninth Circuit's holding

in Boise Cascade Corp. v. United States, 329 F.3d 751 (9th Cir. 2003).  In that case, the Ninth

Circuit found that a corporation's redemption of 507.336 shares of an ESOP trust's

approximately 6.7 million voting preferred shares was a dividend under § 302(b)(1).  See id. at

752-53, 755-56.

Although Boise Cascade is nearly factually identical to the instant case, this Court is

reluctant to rely upon its holding for two reasons.  First, the Government in Boise Cascade

stipulated that the redemption of the trust's 507.336 shares did not result in a meaningful

reduction; instead, the central issue in the case was whether the trust was the owner of those

shares.  Id. at 755.  Second, the opinion does not reveal the trust's proportionate interest in the

corporation before and after the 507.336 share redemption, making an objective comparison to

the figures in this case difficult.  Nevertheless, this Court does take away one important lesson

from Boise Cascade: a reduction in voting power is not per se "meaningful."  Because the

redemption there involved only *voting* shares held by the shareholder-trust, id. 552-53, the trust's

proportionate ownership *and voting power* must have been reduced relative to other shareholders as a result.  Despite this fact, the Government agreed, and the Ninth Circuit held that the reduction was not meaningful, and therefore was a dividend.

Other courts similarly have found that minor reductions in proportionate interest (and attendant rights) were not meaningful.  In particular, courts have done so where the reduction in proportionate interest is small relative to the shareholder's overall holdings in the corporation.  For instance, in Jones v. United States, this Court held that where a redemption decreased a shareholder's proportionate interest in a corporation from 98.5 percent to 96.1 percent (a 2.4 percent reduction in the corporation's stock), the reduction "was clearly de minimis under the meaningful reduction test," and that "ownership of such a vast majority of corporate stock precludes a finding that [a stockholder's] attributed interest had been meaningfully reduced."  Nos. 964-69, 965-69, 1972 U.S. Dist. LEXIS 14548, at *13-14 (D.N.J. March 22, 1973).

Similarly, in Johnston v. Commisioner, a shareholder who owned about 3,510 of 5,348 outstanding voting shares (67.52 percent proportionate interest) in a corporation redeemed 40 of those shares, which lowered her proportionate interest to 67.28 percent.  77 T.C. 679, 683, 685 (1981).  This redemption represented 0.24 percent of the corporation's stock, id. at 685, and, according to this Court's calculation, resulted in approximately a 1.14 percent reduction in the stockholder's holdings (40 is about 1.14 percent of 3510).  Accordingly, the shareholder also experienced a 1.14 percent reduction in voting power and other rights attendant to the stock.  Nevertheless, the shareholder, who was seeking capital gain treatment, did not attempt to argue that this reduction was "meaningful."  Id.  Instead, she sought to prove it was meaningful when

combined with reductions from other years.  This attempt failed, and the Tax Court held that the reduction was not meaningful and thus a dividend.  Id. at 689.[10]

Here, this Court finds that Conopco's July 23, 1997 redemption was so minor that it did not constitute a meaningful reduction.  The 4,746-share redemption from the Trust's approximately 2 million shares reduced the Trust's proportionate interest in Conopco from 2.7884 percent to 2.7809 percent.  Because the Preferred Shares had voting, dividend, and liquidation rights, the Trust's interests in these rights were also reduced accordingly.  Nevertheless, the redemption only reduced these rights by 7.5 thousandths of 1 percent .  Even though the Trust did not have the large majority holdings present in Jones, Johnston, and Fehrs, the reduction was still only a relatively small 0.22 percent of the Trust's approximately 2 million shares.  In comparison, the redemption in Johnston reduced the shareholder's proportionate interest in the corporation by 0.24 percent, and caused in a 1.14 percent decrease in the shareholder's stock.  The reduction here is far less, both in terms of a percentage decrease of the corporation's stock, and as a percentage decrease of the shareholder's stock.

Revenue Ruling 76-385, relied upon heavily by the Government, does not change this result.  In that case, a shareholder owning 0.0001118 percent of the 28 million shares of a public corporation was left with a 0.0001081 percent proportionate interest after a redemption.  Rev.

---

[10] See also Fehrs Finance Co. v. Comm'r, 58 T.C. 174, 185-86 (1972) (holding that a reduction in ownership interest from 98.2 percent to 88.69 percent was not meaningful, especially in light of the shareholder's large overall holding; "the same percentage [reduction] might make a great deal of difference if the initial figure was not such a very high one, and there might be unusual circumstances in which the exact percentage reduction here [of 9.51 percent] would be material"); cf. Wright v. United States, 482 F.2d 600, 610 (8th Cir. 1973) (finding that "although there is no per se rule on what percentage reduction is required to assure that a redemption does not have the effect of a dividend . . . a 23.3 per cent" reduction is "of considerable significance").

Rul. 76-385, 1976-2 C.B. 92, 1976 IRB LEXIS 153, at *1-2.   The IRS found this 0.0000037

percent (3.7 millionths of 1 percent) reduction meaningful "since the redemption involves a

minority shareholder whose relative stock interest . . . is minimal and who exercises no control

over" the corporation.  Id. at *5.

The Government points out that here, the Trust's redeemed stock was a much larger

portion of Conopco's overall holdings (0.0075 percent), and thus, must also be meaningful.  This

argument, however, ignores the emphasis the above cases placed on measuring the percentage

decrease in *the shareholder's stock*, in addition to the percent decrease of the corporation's

stock.  While the number of shares redeemed in Revenue Ruling 76-385 was minuscule

compared to the corporation's 28 million shares, it constituted a 3.3 percent reduction in the

shareholder's already "minimal" holding of about approximately 31.304 shares (0.0001118

percent of 28 million equals 31.304 shares).  In contrast, here, the 4,746 redemption reduced the

Trust's approximately 2 million-share holding by only 0.22 percent, a far less meaningful

reduction as far as the Trust is concerned.

The IRS's own interpretation of the result in Revenue Ruling 76-385 is in accord with

this analysis.  The IRS's chief counsel stated in a 1980 General Counsel Memoranda that

> [i]t can be inferred by the reader [of Revenue Ruling 76-385] that the Service was
> taking into consideration the cumulative effect of the fact that there was a
> reduction as well as the fact that the redemption was from a minority shareholder
> who had no control over the corporation.  Under such circumstances one might
> infer that *any reduction* in proportionate interest was meaningful *since the
> shareholder had a relatively meaningless interest to begin with.*

I.R.S. Gen. Couns. Mem. 38,357 (April 21, 1980), 1980 GCM LEXIS 141, at *14 (emphasis

added).

The percentage decrease in a shareholder's proportionate interest gives a better indication of the effect that decrease has on that particular shareholder, as opposed to measuring that decrease as a percentage of the corporation's outstanding shares.  Cf. I.R.S. Gen. Couns. Mem. 38,357, 180 GCM LEXIS 141, at *10 ("Davis strongly intimates that a shareholder-by-shareholder analysis is the requisite procedure to follow when determining dividend equivalence.").  A 50-share redemption is much more significant to a shareholder with only 100 shares, than it is to a shareholder with 100 million.[11]

This Court finds that where, as here, a shareholder does not have a "relatively meaningless interest" to begin with, not just "any reduction" in proportionate interest will satisfy the "meaningful reduction" test.  Otherwise, under the Government's interpretation of Revenue Ruling 76-385, the word "meaningful" would be read completely out of the Supreme Court's test in Davis.  The Trust in this case started with a 2.7884 percent interest in Conopco, as opposed to the shareholder's 0.0001118 percent interest in Revenue Ruling 76-385.  Because the 4,746-share redemption did not meaningfully reduce the Trust's proportionate interest in Conopco, none of the hundreds of other, smaller redemptions did so either.  Therefore, Conopco's distributions in redemption of stock from the Trust were "essentially equivalent to a dividend," § 302(b)(1), and accordingly, they were dividends for purposes of the § 404(k)(1) deduction, see §§ 316, 302(d), 404(k)(2).

---

[11] Congress has recognized this as well.  In addition to redemptions "not essentially equivalent to a dividend" under § 302(b)(1), "substantially disproportionate redemptions of stock" are also treated as sales and not dividends under § 302(b)(2).  A redemption is "substantially disproportionate" if the shareholder's ownership in the corporation is more than 20 percent less than what it was before the redemption.  See § 302(b)(2)(C)(i)-(ii).

**B.      Whether 26 U.S.C. § 162(k) Disallows the § 404(k)(1) Deduction**

The Government argues that even if § 404(k)(1) permits a deduction for Conopco's

distributions in redemption of the Preferred Shares, the deduction is disallowed by 26 U.S.C. §

162(k).  Section 162(k) states that "no deduction otherwise allowable shall be allowed under

[Chapter One of the IRC] for any amount paid or incurred by a corporation in connection with

the reacquisition of its stock."  Chapter One of the IRC includes § 404(k)(1).  Section 162(k) was

passed to "clarify that all expenditures by a corporation incurred in purchasing its own stock . . .

are nonamortizable capital expenditures."  H.R. Rep. No. 99-426, at 168 (1986).  The provision's

legislative history describes what types of "amount[s] paid or incurred" are considered to be "in

connection with" a reacquisition:

> Congress intended that amounts subject to this provision will include *amounts
> paid to repurchase stock*; premiums paid for the stock; legal, accounting,
> brokerage, transfer agent, appraisal and similar fees incurred in connection with
> the repurchase; and any other expenditure that is necessary or incident to the
> repurchase . . . .

General Explanation of the Tax Reform Act of 1986, H.R. 3838, 99th Cong., Pub. L. No. 99-

514, at 278 (1987) (emphasis added).  The provision's House Conference Report explains what

kinds of payments were not intended to be within the scope of § 162(k):

> [W]hile the phrase "in connection with a redemption" is intended to be construed
> broadly, the provision is not intended to deny a deduction for otherwise
> deductible amounts paid in a transaction that has no nexus with the redemption
> other than being proximate in time and arising out of the same general
> circumstances.  *For example, if a corporation redeems a departing employee's
> stock and makes a payment to the employee in discharge of the corporation's
> obligations under an employment contract, the payment in discharge of the
> contractual obligation is not subject to disallowance under this provision.*

H.R. Rep. No. 99-841, at II-168-69 (1986) (Conf. Rep.), as reprinted in 1986 U.S.C.C.A.N.

4075, 4256-57 (emphasis added).

Relying upon this latter paragraph of legislative history, the Court of Appeals for the

Ninth Circuit held in Boise Cascade that a § 404(k)(1) deduction for payments made by a

corporation to redeem stock held by its ESOP were not precluded by § 162(k).  329 F.3d at 758.

The Ninth Circuit reasoned that "the stock redemption by Boise Cascade and subsequent

distributions to the Plan Participants by the Trustee" were "entirely separate" transactions, and

thus, the distributions to the plan participants were not amounts paid in connection with the

reacquisition of its stock.  Id. at 757-58.  The transactions were "entirely separate," the Court

said, because (1) distributions to plan participants were not automatic upon redemption, and (2)

redemption was "not a prerequisite to the Trustee's duty to make distributions" to plan

participants.  Id. at 758.

Although Conopco encourages this Court to follow Boise Cascade, for the reasons stated

below this Court shall not adhere to the Ninth Circuit's ruling.  In this Court's view the

reasoning of Boise Cascade is flawed, and it is apparent that § 162(k) disallows the § 404(k)(1)

deduction.  Moreover, this Court has contrasted the reasoning and holding of Boise Cascade with

UNUM Corp. v. United States, 130 F.3d 501 (1st Cir. 1997).  As will be discussed infra, UNUM

interprets § 162(k) in a manner consistent with this Court's reasoning.

As this Court has explained, an ESOP member terminating his or her employment with

Conopco could elect to receive, in cash, the value of the Preferred Stock credited to his or her

account held by the Trust.  (See Pl.'s St. of Material Facts ("Pl.'s SMF"), at ¶¶ 19, 23; Stip. of

Facts, Ex. C, at C011231.)  Conopco processed these benefit payment requests, and then

provided the Trust with a "redemption letter" stating the number of shares to be redeemed. (Stip. of Facts, Ex. C., at C011231.)

The ensuing transaction, which is at the heart of the issue here, then proceeded in three steps.  First, the Trust tendered to Conopco the number of Preferred Shares specified in the redemption letter.  (See Pl.'s SMF ¶ 23; Stip. of Facts, Ex. C, at C011231.)

Second, in return, Conopco "made *distributions to the Trust* in redemption of the Preferred Stock."  (Pl.'s SMF ¶ 23 (emphasis added).)  This "distribution" is a payment of "redemption proceeds" (hereinafter, "redemption proceeds distribution").  (Stip. of Facts, Ex. C, at C011231.)  Quite simply, it is the price Conopco paid to the Trust (its shareholder) to buy its Preferred Shares back.  Conopco would "indicate in the Redemption Letter the appropriate price per share and total amount of redemption proceeds," and would "arrange for periodic wire transfers of funds to provide the redemption proceeds" to the Trust in return for the redeemed Preferred Shares.  (Id.)

Third, a second "distribution" then took place: "[T]he Trustee *distributed the funds to members* electing cash distributions within 90 days of the close of the plan year in which the funds were paid [by Conopco] to the Trustee."  (Pl.'s SMF ¶ 23 (emphasis added).)  This second "distribution" is a "benefit payment[] from the Trust" (hereinafter, "benefit distribution").  In addition to the redemption letter, Conopco sent the Trustee a "payout list" instructing the Trust how much to pay each terminating member using the redemption proceeds received in the first "distribution."  (See Stip. of Facts, Ex. C, at C011231-32.)

The flaw in the Ninth Circuit's Boise Cascade analysis (based on identical facts) is that it confuses which distribution the corporation is claiming a deduction for.  It is the *redemption*

18

*proceed distribution* that is the "dividend" entitled to a deduction under § 404(k)(1).  The Ninth

Circuit, however, instead examined whether the *benefit distribution* was made "in connection

with" the reacquisition of stock under § 162(k).  The <u>Boise Cascade</u> Court concluded that the

benefit distribution was not made in connection with the reacquisition.  This is correct, but of no

consequence under § 162(k) because the benefit distribution is not a dividend entitled to a

deduction under § 404(k)(1).  The language of § 404(k)(1) makes this clear.  As explained

earlier, § 404(k)(1) grants a deduction for "any applicable dividend paid in cash by [a]

corporation . . . ."  Therefore, first, the cash must be paid "by [a] corporation," not a shareholder.

Here, obviously, Conopco is the corporation.

Second, the term "dividend," by definition, is a "distribution of property *made by a*

*corporation to its shareholders*." § 316 (emphasis added).  It is not disputed in this case that the

Trust is the shareholder, not the members of the ESOP.[12]  (<u>See</u> Stip. of Facts ¶¶ 21, 26, 29.)

Further, as explained in detail above, the analysis required under <u>Davis</u> and § 302 to determine

whether a "distribution in redemption of stock" is a dividend is entirely focused on the effect the

distribution in redemption has on the shareholder's proportionate interest in the corporation, and

the resulting income tax consequences of the shareholder's receipt of that distribution.  Thus, the

"*distribution* in redemption" that constitutes the dividend is the consideration paid by the

corporation to the shareholder for the stock, not any subsequent distribution made by the

shareholder with those funds.

Third, it is true, as Conopco points out, that § 404(k)(1) does not entirely ignore the

benefit distributions made by the Trust when determining what dividends are deductible.  In

---

[12] In <u>Boise Cascade</u>, this issue was in dispute, however, the Ninth Circuit concluded that the
Trust was the shareholder.  329 F.3d at 755-56.

order to qualify, the dividends must be "applicable," which requires that the Trust's benefit

distributions be made to ESOP members on a timely basis under § 404(k)(2)(A)(ii).  This does

not transform the Trust's benefit distribution into the "dividend"; however, it simply requires

that the Trust use the dividend it received in a certain manner in order for the dividend to be

"applicable."  The language of the statute distinguishes between the two distributions: an

"'applicable dividend' means any dividend which . . . is paid to the plan *and* is distributed in

cash to participants in the plan . . . not later than 90 days after the close of the plan year." §

404(k)(2)(A)(ii) (emphasis added).  That the Trust must use the dividend it received in a certain

way does not change that a "dividend" under the IRC is the distribution "made by a corporation

to its shareholders,"§ 316(a), which here, is the redemption proceed distribution from Conopco

to the Trust.

   As a result, this Court respectfully believes that the Ninth Circuit mistakenly applied §

162(k) to the benefit distribution.  Section 162(k) disallows deductions "for any amount paid or

incurred *by a corporation* in connection with the reacquisition of its stock" (emphasis added);

however, the <u>Boise Cascade</u> Court's analysis examined whether the "distributions to the Plan

Participants *by the Trustee*" were in connection with the "stock redemption by Boise Cascade."

<u>Boise Cascade</u>, 329 F.3d at 757 (emphases added).  As that court recognized, the benefit

distributions are "entirely separate" transactions from the redemption transaction (which of

course includes the redemption proceeds distribution).  The same facts that made the benefits

distribution separate from the redemption proceeds distribution there are also present here: (1)

the benefit distribution did not occur automatically after the redemption transaction, since certain

employees could instead elect to defer their receipt of benefits to a later date, <u>see</u> Pl.'s SMF ¶ 20,

and (2) the Trustee's duty to make benefit distributions was triggered by a member's termination and election to receive benefits, not by Conopco's redemption of shares from the Trust, id. ¶¶ 20-22, 50-51; see also Pl.'s Mem. 22-23; cf. Boise Cascade, 329 F.3d at 758.  As a result, the dividend is entirely separate from the benefit distribution, and thus, the § 162(k) analysis must focus on the former distribution, not the latter.

 The issue here then is whether Conopco's redemption proceed distributions to redeem its Preferred Stock from the ESOP Trust were "amount[s] paid or incurred by a corporation in connection with the reacquisition of its stock."  § 162(k).  This Court concludes that they were.

As the statute's legislative history explains, "Congress intended that amounts subject to this provision will include *amounts paid to repurchase stock* . . . ."  General Explanation of the Tax Reform Act of 1986, H.R. 3838, 99th Cong., Pub. L. No. 99-517, at 278 (1987) (emphasis added).  In addition, the House Conference Report explains that payments that "*represent consideration for the stock* or expenses related to its acquisition" are made "in connection with [a] redemption."  H.R. Rep. No.  99-841, at II-168-69, as reprinted in 1986 U.S.C.C.A.N. at 4256-57 (alteration in original).

Interpreting this legislative history, the United States Court of Appeals for the First Circuit in UNUM Corp. v. United States, 130 F.3d 501 (1st Cir. 1997), held that § 162(k) barred a life insurance company from taking a deduction for cash and stock it distributed to its policyholders in redemption of their equity interests in the company.  Id. at 512.  The life insurance company sought to treat these distributions as "policyholder dividends" entitled to a deduction under 26 U.S.C. §§ 805, and 808(b).  Id. at 502.  The UNUM Court found that the distributions were not entitled to a deduction, id. at 510, and that in any event, such a deduction would be disallowed by § 162(k), id. at 511-12 & n.12.  Quoting § 162(k)'s legislative history,

21

the UNUM Court explained that § 162(k) disallows the deduction because "the payment 'does . . . represent consideration for the [membership interests] or expense related to [their] acquisitions . . . .'" Id. (quoting H.R. Rep. No. 99-841, at II-168, as reprinted in 1986 U.S.C.C.A.N. at 4257) (alterations in original).  As the UNUM Court further explained, § 162(k) "unreservedly prohibits corporations from taking deductions for distributions made in the course of reacquiring its stock." Id. at 511.

Similarly, here, the redemption proceed distribution Conopco paid to the Trust is the amount it paid to repurchase its Preferred Shares.  The distribution was Conopco's consideration for its shareholder's stock.  Thus, these distributions were "amount[s] paid or incurred by a corporation in connection with the reacquisition of its stock," and accordingly, not entitled to be deducted under § 162(k).

Even the legislative history relied upon by Boise Cascade and by Conopco supports this conclusion.  As mentioned above, the House Conference Report explains that, in contrast to "consideration for the stock," amounts paid that have "no nexus with the redemption other than being proximate in time or arising out of the same general circumstances" are not barred by § 162(k) from being deducted.  H.R. Rep. No. 99-841, at II-168-69, as reprinted in 1986 U.S.C.C.A.N. at 4256-57 (emphasis added).  As an example, the report states that where "a corporation redeems a departing employee's stock and makes a payment to the employee in discharge of the corporation's obligations under an employment contract, the payment in discharge of the contractual obligation is not subject to disallowance under this provision."  Id. At first glance, it appears that this language indicates that § 162(k) bars deductions for ESOP distributions in general.  However, upon close examination, it is apparent that two transactions

are described in this example: a redemption, and a latter payment to the employee.  It is only the

latter, separate "payment in discharge of the contractual obligation [that] is not subject to

disallowance under this provision," id. at 4257, as opposed to the "consideration for the stock,"

which is paid during the redemption transaction.  Thus, this portion of the legislative history also

supports this Court's finding that Conopco's redemption proceed distributions may not be

deducted under § 162(k).

## IV.  Conclusion

For the foregoing reasons, this Court concludes that § 404(k)(1) allows a deduction for

sums Conopco paid to the ESOP Trust in return for its Preferred Shares.  Because those

distributions were made "in connection with the reacquisition of its stock," however, the

deduction is disallowed under § 162(k)(1).[13]  Accordingly, the United States' cross-motion for

summary judgment will be granted, and Conopco's motion for summary judgment will be

denied.


 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.


Dated:  July 17, 2007

---

[13] Due to this conclusion, this Court need not address the Government's allegations that those
deductions are also not permitted under § 404(k)(5)(A), and the double-deduction doctrine.